ATCHISON, T. & S. F. RY. CO.
v. BISHOP.
SAME v. STOCKTON et al.

Nos. 33066, 33067.  June 8, 1948.

Rehearing Denied June 7, 1949.

*207 P. 2d 282.*

Rainey, Flynn, Green & Anderson, of Oklahoma City, for plaintiff in error.

Embry & Sutton, of Chandler, for defendants in error.

RILEY, J.  On and prior to February 8, 1946, Worall C. Bishop, defendant in error in Case No. 33066, was the owner of the west half of southeast quarter section 6, township 13 north, range 5 east, in Lincoln county.  Alta Grace Stockton and L. G. Stockton, wife and husband, defendants in error in case No. 33067, were the owners of the east half of the quarter section of land. The land is in the valley of Deep Fork creek, a tributary of the North Canadian river.

About 1902, the Atchison, Topeka & Santa Fe Railway Company, or its predecessor, the Eastern Oklahoma Railway Company, acquired a right of way 200 feet in width across the southeast corner of the west half of the quarter section of land and across the east half of the quarter section, running in a northeasterly direction.  A railroad was constructed there.

The right of way enters the east half of the quarter section about 200 feet north of the southwest corner. It runs out on the east side about the middle of the east line.

At that time, the channel of Deep Fork creek entered the Stockton land from the north, 250 feet east of the northwest corner. Deep Fork creek runs in a southeasterly direction to a point 200 feet west of the east line, and 800 feet south of the north line; there it turned to a southerly direction for 200 feet, thence in a southeasterly direction. It crosses the railroad right of way and runs across the east line of the Stockton land 200 feet south of the center line of the railroad right of way. The creek then turns sharply back east and north and runs for a short distance nearly due north at a location 100 feet east of the east line of the Stockton land. At that point, the creek turns to the southeast, thus forming a partial horseshoe on the Stockton land and partly on land to the east.

A smaller creek, Quapaw creek, enters the Bishop land from the west 660 feet north of the southwest corner. This creek runs across the Bishop land in a northeast direction. It enters the Stockton land a short distance north of the center of the west line. It runs to the east and north and enters the channel of Deep Fork creek near the center of the north 40 acres of the Stockton land.

The railroad, in constructing its roadbed, erected an embankment entirely across the valley of Deep Fork creek. The railroad company erected a bridge over the highway where the railroad crosses the south line of the quarter section of land. In the record, the bridge is designated as Bridge 108-B. The railroad company also erected a bridge over Deep Fork creek and the public highway running north along the east side of the Stockton land. This is Bridge 108-A.

On February 8, 1946, Worall C. Bishop commenced an action against the Atchison, Topeka & Santa Fe Railway Company. In the first cause of action, plaintiff sought injunctive relief and alleged that the roadbed maintained by defendant across Deep Fork Valley and across plaintiff's land is elevated so as to completely obstruct the overflow water from Deep Fork and Quapaw creeks from the west and north; that the water, for failure to provide drainage, was cast on plaintiff's land where it remained until it evaporated or percolated into the soil. That the water was collected and stood for long periods of time at a considerable depth at the opening under the bridge along the highway. That because of this water and the boggy condition of the passage and highway, plaintiff is prevented from going to and from his land for the purpose of cultivation and harvesting his crops. On each side of defendant's roadbed there are deep ditches paralleling the roadbed in a northeasterly direction toward Deep Fork. These ditches are the only means of draining the water from plaintiff's land and the highway. Although plaintiff had repeatedly called the railroad company's attention to the condition, the company has neglected to keep the drainage system in repair and has allowed the northern termini of the ditches to become completely obstructed and has failed and refused to keep the ditches in repair; as a result, plaintiff's land has been rendered worthless for agricultural purposes; plaintiff has been prevented from going upon his land for the purpose of farming it, and by reason thereof plaintiff has been irreparably damaged and has no complete adequate remedy at law.

Plaintiff sought a permanent injunction to enjoin defendant from allowing its drainage system to remain so deteriorated, and for a mandatory injunction compelling defendant to clean out the ditches and properly maintain them so the water would flow into the main channel of Deep Fork drainage ditch, and for other proper relief.

By the second cause of action, plaintiff sought damages for loss of crops on about twelve acres of his land during the year 1944.

This was action No. 14257 in the trial court.

On the same date, Alta Grace Stockton and L. B. Stockton commenced a similar action against the railroad company. In their first cause of action, these plaintiffs made allegations similar to those in the Bishop case. They further alleged the only means of ingress and egress to and from their land is a drive along the railroad right of way which had been dedicated to public and used by the public as a highway for more than 20 years.

These plaintiffs further alleged that the defendant could, by slight expenditure, extend its drainage system approximately 200 feet to the main channel of Deep Fork and repair the natural outlet which theretofore drained the ditches.

By a second cause of action, plaintiffs sought damages for loss of crops during the years 1944 and 1945.

Defendant answered in both cases by general denial, admitting, however, its corporate character and its operation as a railroad throughout the State of Oklahoma.

Before defendant answered in the Bishop case, plaintiff in that action dismissed as to his cause of action for damages. On September 9, 1946, these causes came on for hearing; by agreement of all parties, the causes were consolidated as to injunctive relief.

A hearing was had in the consolidated cause on the issue of injunctive relief only. The hearing resulted in a finding in favor of plaintiffs. Defendant was required to open, and keep open, the ditches on each side of its railroad track between Bridges 108-B and 108-A so as to drain the water flowing from the west of Bridge 108-B along the railroad's right of way, and required to construct properly and maintain drainage along its right of way and across the land and to connect the borrow pits with the main channel of Deep Fork creek.

Defendant was further ordered to provide and maintain an adequate underpass under its railroad track at the intersection of the tracks with the section line highway between sections 6 and 7 at the point designated and known as Bridge 108-B. Separate findings and decrees were entered in the two cases. Defendant appeals.

It is contended the judgment and decrees are contrary to law and are not sustained by sufficient evidence; that they are contrary to the weight of the evidence.

An examination discloses the evidence fully sustains the plaintiffs' allegations as to the natural slope of the south part of the land of plaintiffs. On both sides of the section line running east and west between sections 6 and 7, drainage is to the east and south, that is, slightly to the east of south. The natural course of flood water coming upon the land from the overflow of Quapaw creek, before the construction of the railroad embankment, was in that general direction. The witnesses so testified. The map and plat prepared by defendant and introduced in evidence by plaintiff at the suggestion and by the consent of defendant, so shows.

The evidence does not show how high the embankment of the railroad is above the general elevation of the adjoining land, but the record does show that the erection of the embankment obstructed the free flow and drainage of the flood waters and surface water from the south part of the lands of both plaintiffs. This embankment backs the water up on the land and the water stands there for long periods of time.

The embankment which runs from the southwest to the northeast is almost at right angles with the natural flow of the water. The elevation of the

natural surface of the land is from .8 foot to 1 foot higher at Bridge 108-A than it is at Bridge 108-B; but when the railroad company constructed its railroad it took the earth from either side of the roadbed to construct the embankment, leaving "borrow pits" on either side of the embankment, and these were so excavated as to constitute a continued channel on either side of the railroad embankment running from a point near Bridge 108-B to and into the main channel of what was Deep Fork creek at the place where Bridge 108-A was constructed. There is some conflict in the evidence as to whether these ditches were so constructed for the purpose or with the idea of drainage.

The testimony of two witnesses for defendant, one of whom was a Santa Fe division engineer and the other a civil engineer in the employ of defendant, was to the effect that the borrow pits were dug only for the purpose of getting dirt or earth for the construction of the embankment and without view to drainage. These witnesses were not in the employ of the company at the time the roadbed was constructed. They could testify only from their experience as engineers and from the profiles, etc.

But the uncontradicted evidence was that for more than 40 years after the construction of the railroad, the surface water and flood waters, after the flood subsided, flowed to the northeast through said ditches from Bridge 108-B to and into the main channel of what was Deep Fork creek near Bridge 108-A. Furthermore, the map and plat prepared by defendant, and used in evidence, showed the elevations of the bottom of both borrow pits, or ditches, to be from .5 to .8 foot lower at the point where they entered the channel of Deep Fork creek than at the point near Bridge 108-B. It is difficult to understand why the ditches were so constructed unless it was for the very purpose which they did serve for many years of drain-

ing the water from said land and right of way.

But that is not all. The uncontradicted evidence shows that sometime in the spring of 1945, in widening the abutment or railroad embankment near Bridge 108-A, defendant dragged dirt into and entirely filled the ditches at the point where they entered the channel of Deep Fork creek. After this was done, the water backed up and stood upon plaintiffs' land.

However, there is another element which enters into the case. The evidence took a somewhat broader turn than the allegations in the pleadings but that which was beyond the pleadings was introduced without objection, and the pleadings may be treated as amended to conform to the proof.

It appears that after the railroad was constructed (the time not being definitely shown), there was a drainage ditch constructed along and through the valley of Deep Fork creek. By what authority this drainage ditch was constructed does not appear, but it was probably done by or through the creation of a drainage district. The drainage ditch, in the vicinity of the land involved, was cut along the east side of Deep Fork creek. It enters the Stockton land at about the middle of the north line and runs almost directly southeast across the northeast corner of the Stockton land, and out of the land on the east side near the north line of the railroad right of way. Thereby, the flow of water through what was the channel of Deep Fork creek was diverted through the drainage canal to a point where Quapaw creek entered the old channel. From the entrance of Quapaw creek for some distance south, the old channel of Deep Fork was left open and utilized for the flow of water from the mouth of Quapaw creek down to a point about 200 feet north of Bridge 108-A, where a new channel was cut south and east into the drainage canal. This apparently cut off the flow of water through the old channel at a

point about 200 feet north of Bridge 108-A to and under the railroad at or near the southwest end of the bridge and on down through the loop or horse-shoe where the old channel entered into the new drainage ditch. It did so at an opposite angle to the flow of the water in the drainage canal. This left an oval shaped parcel of land about 400 feet long, north and south, and about 100 feet wide, between the old channel and the drainage canal running under the railroad at Bridge 108-A. The public highway running north and south on the east side of the Stockton land also crossed said Bridge 108-A.

By erosion, overflow, or the backing up of the water, the old channel, thus cut off, gradually filled up, so that the water which formerly flowed from the drainage ditches on each side of the railroad track does not readily flow on and into the new drainage canal. This condition partially prevents, and will in time entirely prevent, the flow of water from said borrow pits or drain-age ditches to the new drainage canal. For this condition, defendant contends it is not responsible and that it is not incumbent upon it to remedy a con-dition brought about by an intervening third party or agency.

Apparently, the defendant considers the judgment of the trial court to mean that defendant must, in addition to opening and cleaning out the two drain-age ditches, by some means extend these ditches on into the new drainage canal. There is evidence of two ways by which this may be done.

Defendant asserts that the only prac-tical way it could be done, from an engineering standpoint, is to cut a new ditch or canal from the ends of the two drainage ditches southeast to the drainage canal at an angle so the water would flow into the drainage canal with the current in the canal. Defend-ant asserts that this would necessitate going some distance off the railroad right of way and might require con-demnation of land for that purpose.

Plaintiffs contend, and there is some evidence to the effect, that satisfactory results could be obtained at small cost by bringing the two ditches together in the old channel of Deep Fork creek under the bridge and running a pipe about 100 feet to the southeast into the new drainage canal and placing a sand trap or overflow valve therein to pre-vent the backflow of water, and that this could readily be done entirely on or within the railroad's right of way.

We do not believe that under the rule stated in Chandler v. Kurn et al., Trus-tees of St. Louis-San Francisco Ry., 198 Okla. 557, 180 P. 2d 651, the defend-ant can be compelled to remedy a con-dition brought about by a third party or intervening agency. The facts in the Chandler case, supra, are somewhat different, but the principle involved is practically the same. There, the dam-age of which Chandler complained was caused by the erosion or washing away of the banks of a drainage canal con-structed along and parallel with the railroad right of way after the con-struction of the railroad and allowing water to escape therefrom and flow up-on plaintiff's land, principally through borrow pits dug by the railroad com-pany in constructing its railroad bed. It was held that under the facts shown the railroad company was not liable because the evidence showed that it was not negligent in the first instance in constructing its grade and borrow pits and that the railroad company was not liable for the faulty construction or negligent maintenance of the drainage canal.

It is probable that full relief and proper drainage can only be obtained by making the drainage district, if there be one, which constructed the drainage canal, a party defendant. There is abundant evidence to support the judgment of the trial court insofar as it requires defendant to open prop-erly, and keep open and clean out, the drainage ditches and the entrance thereof into the old channel of Deep Fork creek. That is as far as the judg-

ment apparently goes. It says that defendant is required to construct and maintain its drainage system connecting it with the main channel of Deep Fork creek so as to permit the water that accumulates in said borrow pits or ditches to flow uninterruptedly into said Deep Fork creek. It does not say into the drainage canal. As so construed, the judgment of the trial court in both cases is fully sustained by the evidence.

Affirmed.

HURST, C.J., DAVISON, V.C.J., and CORN and LUTTRELL, JJ., concur. GIBSON, J., dissents.